**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL 33 HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLERGAN PLC; ACTAVIS, PLC; IMPAX LABORATORIES, INC.; LANNETT, INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL COMPANIES, INC.; and WEST-WARD PHARMACEUTICALS CORP.<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

Plaintiff Plumbers & Pipefitters Local 33 Health and Welfare Fund ("Plaintiff"), by its undersigned counsel, individually and on behalf of all others similarly situated, alleges the following against Defendants Allergan PLC ("Allergan"); Actavis PLC ("Actavis"); Impax Laboratories, Inc. ("Impax"); Lannett, Inc. ("Lannett"); Mylan Pharmaceuticals, Inc. ("Mylan"); Par Pharmaceutical Companies, Inc. ("Par"); and West-Ward Pharmaceuticals Corp. ("West-Ward").   based, as to itself, on personal knowledge, and on information and belief in all other respects, based on the investigation of counsel.  This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and based on a federal question, 28 U.S.C. § 1331.

1

## NATURE OF THE ACTION

1.      This is a nationwide indirect purchaser antitrust action arising out of a conspiracy to maintain supracompetitive prices for doxycycline and digoxin, two generic drugs with life-saving properties that have been widely and cheaply available as generics for decades.

2.      For decades the generic pharmaceutical industry has been high-volume, low-margin, steady, and profitable, in recent years some of the world's largest manufacturers of generic doxycycline and digoxin have (along with other, as-yet-unknown entities) conspired to inflate, fix, raise, maintain, or artificially stabilize the prices of these two drugs.

3.      The United States Congress, along with federal and state agencies, have opened investigations into several manufacturers, including Defendants Allergan, Actavis, Lannett, Par, Impax, and Mylan[1]

## PARTIES

4.      Plaintiff Plumbers & Pipefitters Local 33 Health and Welfare Fund is a health and pension fund for a local union headquartered in Des Moines, Iowa.  During the Class Period, Plaintiff indirectly purchased, paid, and/or provided reimbursement for generic digoxin and doxycycline made by one or more Defendants, or whose prices were fixed by one or more Defendants, at supracompetitive prices in the States of California, Iowa, Kansas, Minnesota, Missouri, Nebraska, New York, South Dakota, and Utah during the Class Period.  As a result of the alleged conspiracy, Plaintiff was injured in its business or personal property by reason of the violations of law alleged herein.

---

[1] It is not known if Defendant West-Ward has received a subpoena as West-Ward's foreign parent company, Hikma Pharmaceuticals PLC, does not make disclosures to the United States Securities and Exchange Commission (the "SEC").

5.     Defendant Allergan plc is a pharmaceutical corporation incorporated in the Republic of Ireland and headquartered in Dublin and Parsippany-Troy Hills, New Jersey.  Allergan is the third-largest generic drug manufacturer in the United States with more than 40 manufacturing and distribution facilities around the world and a capacity of approximately 40 billion units annually.  Allergan was acquired by Defendant Actavis in March 2015.  During the Class Period, Allergan sold generic doxycycline and digoxin to customers in this District and throughout the United States.

6.     Defendant Actavis plc is a pharmaceutical corporation incorporated in the Republic of Ireland and headquartered in Dublin and Parsippany-Troy Hills, New Jersey.  Actavis acquired Allergan, Inc. in March 2015 and subsequently changed its name to Allergan plc.  However, the company's U.S. and Canadian generics business continues to operate under the Actavis name.  During the Class Period, Actavis sold generic doxycycline and digoxin to customers in this District and throughout the United States.

7.     Defendant Impax Laboratories, Inc. is a pharmaceutical corporation incorporated in Delaware and headquartered in Hayward, California.  Impax's generics division is Global Pharmaceuticals, which has a portfolio of 96 generic pharmaceutical products, including generic doxycycline and digoxin.  Globally, Impax has production capability of at least 1.7 billion units per year.  During the Class Period, Impax sold generic doxycycline and digoxin to customers in this District and throughout the United States.

8.     Defendant Lannett Company, Inc. is a pharmaceutical corporation incorporated in Delaware and headquartered in Philadelphia, Pennsylvania.  Lannett specializes in sales of generic pharmaceuticals to drug wholesalers, retail drug chains, distributors, and government agencies.

During the Class Period, Lannett sold generic doxycycline and digoxin to customers in this District and throughout the United States.

9.     Defendant Mylan, Inc. is registered in the Kingdom of the Netherlands and is headquartered in Hatfield, Hertfordshire, United Kingdom.  Its principal place of business in the United States is located in Canonsburg, Pennsylvania.  Mylan has global production capability of at least 40 billion units per year.  During the Class Period, Mylan sold generic doxycycline and digoxin to customers in this District and throughout the United States.

10.     Defendant Par Pharmaceutical Companies, Inc. is a pharmaceutical corporation incorporated in Delaware and headquartered in Chestnut Ridge, New York.  Par is currently the fifth-largest generic pharmaceutical corporation in the United States.  During the Class Period, Par sold generic doxycycline and digoxin to customers in this District and throughout the United States.

11.     Defendant West-Ward Pharmaceutical Corp. is a wholly-owned subsidiary of Hikma Pharmaceuticals PLC.  Hikma is based in Amman, Jordan, and headquartered in London, United Kingdom.  West-Ward itself is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  West-Ward has a portfolio of more than 90 pharmaceutical products, including generics.  During the Class Period, West-Ward sold generic doxycycline and digoxin to customers in this District and throughout the United States.

## AGENTS

12.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

13.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are not presently known, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of anticompetitive conduct.  Plaintiff reserves the right to name some or all of these persons or entities as Defendants at a later date.

14.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to Section 16 of The Clayton Act, 15 U.S.C. § 26, to secure injunctive relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.  This Court also has original federal question jurisdiction over the Sherman Act claim asserted in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 16 of The Clayton Act, 15 U.S.C. § 26.

16.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are at least 100 members of the proposed class, at least one of whom is a citizen of a different state than Defendants, and the aggregate claims of the proposed class members exceed $5,000,000, exclusive of interest and costs.

17.     Venue is proper in this District under 28 U.S.C. § 1391 because at all times relevant to the complaint, Defendants resided in this District, transacted business in this District, were found

with or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

18.     In addition, venue is proper because Defendant Lannett has its principal place of business in this District.

## FACTUAL ALLEGATIONS

19.     Generic drugs are a cornerstone of modern-day prescription medicine – an essential option that allows life-saving healthcare for people throughout the United States.

20.     Generics are biochemically and therapeutically identical to their brand-name alternatives, and are comparable in dosage, form, strength, quality, and performance in their intended uses.

21.     Generics are functional copies of their brand-name equivalents, but are sold at a much lower price point, often making them a preferred substitute of prescribing physicians and dispensaries.

22.     The United States is the world's largest drug market, and approximately 86% of all prescriptions filled are for generics[2].

23.     In 2010, the use of FDA-approved generics amounted to a savings of approximately $158 billion to consumers and insurers.  Since the passage of the Hatch-Waxman Act. (15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282), every state has adopted substitution laws that require or permit pharmacies to substitute generics for branded drug prescriptions.

---

[2] *See* http://blogs.wsj.com/pharmalot/2014/11/10/justice-department-probes-generic-competition-after-price-hike-reports/, last accessed June 15, 2016.

24.    The Generic Pharmaceutical Association estimates that from 2003 to 2012, generics have generated more than $1.2 trillion in savings[3].

**A.    Defendants' Price Increases**

25.    Doxycycline is a decades-old generic antibiotic that is on the World Health Organization's Model List of Essential Medicines[4].  It can be used to treat numerous infections, from syphilis and gonorrhea to Lyme Disease and malaria[5].  On the international market, it routinely sells for 1.2 to 1.8 **cents** per tablet[6].

26.    Digoxin (which is similar to digitoxin, a foxglove extract who use dates to the 18th Century) is a decades-old generic drug that is used to treat various heart conditions.  It too is on the World Health Organization's Model List of Essential Medicines[7].  On the international market, 0.25 mg tablets routinely sell for 0.7 to 5 **cents** each[8].

---

[3] *See* http://www.nytimes.com/2014/10/08/business/officials-question-the-rising-costs-of-generic-drugs.html, last accessed June 15, 2016.

[4] *See* http://www.who.int/medicines/publications/essentialmedicines/EML2015_8-May-15.pdf, last accessed June 15, 2016.

[5] *See* https://www.drugs.com/monograph/doxycycline-calcium.html, last accessed June 15, 2016.

[6] *See* http://erc.msh.org/dmpguide/resultsdetail.cfm?language=english&code=DOX100T&s_year=2014&year=2014&str=100%20mg&desc=Doxycycline&pack=new&frm=TAB-CAP&rte=PO&class_code=06%2E5%2E3%2E1&supplement=&class_name=%2806%2E2%2E2%2E%29Other%20antibacterials%3Cbr%3E%2806%2E5%2E3%2E1%29Antimalarial%20medicines%2C%20for%20curative%20treatment%3Cbr%3E, last accessed June 15, 2016.

[7] *See* http://www.who.int/medicines/publications/essentialmedicines/EML2015_8-May-15.pdf, last accessed June 15, 2016.

[8] *See* http://erc.msh.org/dmpguide/resultsdetail.cfm?language=english&code=DIG025T&s_year=2014&year=2014&str=0%2E25%20mg&desc=Digoxin&pack=new&frm=TAB-CAP&rte=PO&class_code2=12%2E4%2E&supplement=&class_name=%2812%2E4%2E%29Medicines%20used%20in%20heart%20failure%3Cbr%3E, last accessed June 15, 2016.

27.     Price increases for these drugs in the United States have been astronomical.  From October 2013 to April 2014, the price of a bottle of 500 tablets of doxycycline rose from $20 to $1,849.  From 2012 to 2014, the price of a tablet of digoxin rose from $0.11 to $1.10.

28.     For doxycycline, the pattern of astronomical price increases began in the fall of 2012, a year earlier than for that of digoxin.  The following chart indicates West-Ward's pricing for generic doxycycline between October 2012 and January 2013:



29.     Total retail sales of generic doxycycline in the United States in 2013 were estimated to be more than $973 million.  The primary manufacturers in the generic doxycycline market are Allergan, Actavis, Lannett, Mylan, Par, and West-Ward, who together effectively control the market.

30.      There were no reasonable justifications for this price increase.  The FDA requires reporting of drug shortages, including the reasons for the shortage and the expected duration of the shortage.  There was a shortage of doxycycline reported in January 2013, but it was resolved by October 2013[9], but in all events took place outside the window of the price increase.

31.      To this day, the price of generic doxycycline remains artificially inflated, causing extreme hardship to consumers and payors of prescription drugs.

32.      According to its August 27, 2015 Form 10-K, Lannett has been involved in generic digoxin distribution since at least March 2004.  Lannett distributes two potencies of generic digoxin, a 0.125 mg tablet and a 0.250 mg tablet.

33.      As reflected in their Form 10-Ks from 2011 to 2014, Lannett's sales of generic digoxin totaled $12.4 million in 2011, $10.9 million in 2012, $11.7 million in 2013, and $54.7 million in 2014.  A $43 million increase occurred between 2013 and 2014.

34.      By October 2013, the generic digoxin market was essentially a duopoly between Lannett and Impax.  West-Ward also produced generic digoxin, but was required to suspend operations in November 2012 in the wake of an FDA investigation involving production problems. After spending $39 million in remediation efforts, West-Ward was allowed to resume production in July 2013[10].

35.      The following chart shows the price increases for generic digoxin during the relevant period:

---

[9] *See* http://www.cdc.gov/std/treatment/drugnotices/doxyclineshortage.htm, last accessed June 15, 2016.

[10] *See* http://www.health-os.com/?p=324, last accessed June 15, 2016.



36.     The sudden departure from low, stable prices in October 2013 were caused by abrupt pricing changes made by Lannett, Impax, and West-Ward, and were followed by Mylan in 2014 and Par in 2015.

37.     By the end of 2013, 0.125- and 0.25-mg tablets of digoxin had increased in price by roughly 750%, from 11 and 12 cents per tablet, respectively, to $0.91 to $1.01 per tablet. Between December 2013 and January 2014, prices rose again, to $1.08 and $1.11 per tablet, respectively.

38.     There were no reasonable justifications for the increase in digoxin pricing, either. No shortages of digoxin were reported to the FDA in the Fall of 2013.

39.     The artificially-inflated prices of digoxin remained high even while West-Ward was removed from the market.  As Par and Mylan entered the market in 2014 and 2015, respectively, new competitors should have been expected to drive the price lower.  However, this did not occur.

40.     To this day, the price for generic digoxin remains artificially high, causing extreme hardship to consumers and payors of prescription drugs.

**B.     Governmental Investigations of Defendants**

41.     As a result of the unseemly profits made by generic drug manufacturers, including Defendants, the Department of Justice ("DOJ") Antitrust Division commenced in the Fall of 2014 a criminal investigation in to the broad conspiracy involving generic drug prices.  It has caused grand jury subpoenas to be issued to several Defendants named in this complaint.

42.     The investigation encompasses more drugs than just digoxin and doxycycline, and as the scope of the DOJ's investigation gains further clarity, Plaintiff reserves the right to amend its complaint to include additional parties and/or claims.

43.     The generic drug price increases outlined (as well as those not yet clear) have also led to scrutiny by members of the United States Congress, including Senator Bernie Sanders of Vermont and Congressman Elijah Cummings of Maryland.  Sanders' committee held a hearing in November 2014 on the price increases.  In spite of invitations, no CEO of any generic drug manufacturer chose to appear to testify.

44.     The Attorney General of Connecticut has also opened an antitrust investigation into the price of digoxin.  Lannett, Impax, and Par have all been issued subpoenas by the Attorney General of Connecticut.

**C.**     **SEC Filings by Defendants Reveal Further Investigations**

45.     As stated *supra*, Lannett, Impax, Par, Allergan, Actavis, and Mylan have all received DOJ grand jury subpoenas.  These have all been acknowledged in their SEC filings.  It is not know if West-Ward has received one as its foreign parent does not make SEC disclosures.

46.     Lannett stated that on "November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[11].

47.     Par issued a similar disclosure in their March 12, 2015 10-K.  It stated, in part, that on "December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[12]

48.     Impax's 2014 Form 8-K also disclosed a DOJ subpoena regarding their generic production of generic digoxin and doxycycline[13].

49.     Allergan and Actavis have also disclosed that on "June 25, 2015, the Company received a subpoena from the U.S. Department of Justice. . . Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[14]

---

[11] *See* http://www.sec.gov/Archives/edgar/data/57725/000110465915007227/a14-26533_110q.htm, last accessed June 15, 2016.

[12] *See* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm, last accessed June 15, 2016.

[13] *See* http://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm, last accessed June 15, 2016.

[14] *See* https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm, last accessed June 15, 2016.

50.     Further, Mylan's 8-K from December 4, 2014 also acknowledged receipt of a DOJ subpoena relating to generic doxycycline pricing and production[15].

**D.     Additional Anticompetitive Statements**

51.     Lannett CEO Arthur Bedrosian openly stated his company's intention to increase prices and his expectation that competitors would follow suit.  With respect to Kevin Smith, one of his subpoenaed employees, Bedrosian stated in a corporate earnings call on September 10, 2013:

> "We tend to be a price leader on price increases and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process… And he's done a good job there… We believe that these prices are important. We need to try raising them… I am finding a climate out there has changed dramatically and I see more price increases coming from our competing -- competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit."[16]

52.     In a subsequent earnings call on November 7, 2014, Bedrosian confirmed that Lannett's primary competitor had obliged Lannett's price increase signal, saying, "[W]e've been successful in benefitting from the difficulties of our competitors who have left the market and as a result, our market share has continued to grow.  We've had a recent price increase on the product as well because we are now only 1 of 2 people in the market."[17]

53.     Par's entry in to the marketplace for generic digoxin was met with the following statement by Bedrosian: "[W]e see Par as one of our rational competitors in the marketplace. .

---

[15] *See* https://www.sec.gov/Archives/edgar/data/1623613/000119312515394875/d225442d8k.htm, last accessed June 15, 2016.

[16] *See* http://seekingalpha.com/article/1685792-lannett-management-discusses-q4-2013-results-earnings-call-transcript?page=5, last accessed June 15, 2016.

[17] *See* http://seekingalpha.com/article/1820502-lannett-management-discusses-q1-2014-results-earnings-call-transcript?part=single, last accessed June 15, 2016.

.we're not troubled by their pricing in the marketplace.  Not at all. . .[t]he prices they're quoting are not doing us any harm at all."[18]

54.     On February 4, 2015, Bedrosian went so far as to say that there would effectively be a moratorium on price competition in the generic marketplace, saying "I think you're going to find more capital pricing, more – I'll say less competition, in a sense.  You won't have price wars."[19]

55.     Lannett also noted a 71% year-on-year second quarter sales increase in fiscal year 2015, driven in part by sales of generic digoxin[20].

56.     Similarly, Impax noted an increase in revenue from $511 million in 2013 to $596 million in 204, in part due to "higher sales of our Digoxin."[21]

**E.     The Market for Generic Drugs Is Highly Conducive to Price-Fixing and Collusion**

57.     The generic drug industry has several characteristics that make it conducive to collusion: high barriers to entry, inelastic demand, a highly concentrated market, homogenous products, and a lack of purchaser buying power.  Each of these characteristics is clearly present.

58.     A new entrant faces a lengthy start-up process and high costs, including highly technological facilities and a regulatory approval process from not just the FDA, but from other nations' drug regulators as well.

---

[18] *See* http://seekingalpha.com/article/2002271-lannett-management-discusses-q2-2014-results-earnings-call-transcript?part=single, last accessed June 15, 2016.

[19] *See* http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript, last accessed June 15, 2016.

[20] *See* http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript, last accessed June 15, 2016.

[21] *See* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true, last accessed June 15, 2016.

59.     Demand for generic drugs is inelastic.  This is particularly true of doxycycline and digoxin as both are essential for treatment for multiple diseases or conditions, and must be purchased regardless of cost – especially when compared to even-higher-priced brand name options.

60.     The market has become highly concentrated.  In 2003, there were eight manufacturers of digoxin.  By 2013, there were only three.  During that time, the price of generic digoxin increased 637%.  While there are more producers of doxycycline, the Defendants listed *supra* control the lion's share of the production facilities for generic doxycycline.

61.     Generic drugs are highly homogenous.  Indeed, that is their entire purpose: they must be manufactured according to specific biochemical formulae that are publicly available and meet FDA and other regulators' therapeutic equivalency requirements.  Each tablet of digoxin is biologically identical to every other table of digoxin.  The same is true of doxycycline.

62.     Additionally, generic drugs are commodities.  Markets for commodities are particularly conducive to collusion because competition for those products is based principally on price rather than on product quality or customer service.  Producers wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement because differences in price are the sole method of detecting cheating on the conspiracy.

63.     Further, purchasers lack buying power in the generic drug market.  Given partial payments by insurers, companies, plan administrators, and lastly consumers, no one payor has sufficient power to push back against Defendants' price increases.  Additionally, the lack of close, functional substitutes for generic doxycycline and digoxin (aside from their much more expensive name-brand versions) give Defendants market power to set prices artificially high.

64.     Lastly, Defendants are all members or participants in the Generic Pharmaceutical Association (or "GPhA"), a trade association for manufacturers and distributors of generic prescription drugs.  GPhA was founded in 2000 after the merger of the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

65.     Impax, Mylan, and Par additionally have members on the 2016 GPhA Board of Directors, giving them additional opportunity to meet, have improper discussions, and perform acts necessary to further the conspiracy.

66.     GPhA's 2015 Annual Report noted that "GPhA member companies supply nearly 90 percent of the generic prescription drugs dispensed in the U.S. each year."[22]

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action on behalf of itself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the following Classes:

> All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period for equitable and injunctive relief under the Sherman Act (The "Sherman Act Nationwide Class");
>
> All persons and entities in the State of California who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "California Class");
>
> All persons and entities in the State of Iowa who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Iowa Class");

---

[22] *See* http://www.gphaonline.org/media/wysiwyg/GPhA2015AnnualReport.pdf, last accessed June 15, 2016.

All persons and entities in the State of Kansas who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Kansas Class");

All persons and entities in the State of Minnesota who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Minnesota Class");

All persons and entities in the State of Missouri who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Missouri Class");

All persons and entities in the State of Nebraska who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Nebraska Class");

All persons and entities in the State of New York who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "New York Class");

All persons and entities in the State of South Dakota who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "South Dakota Class"); and

All persons and entities in the State of Utah who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products during the Class Period (The "Utah Class").

68.    The Class Period is from October 1, 2012 through the present.

69.    Excluded from the Classes are: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic doxycycline and/or generic digoxin products for purposes of resale or directly from defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose

17

purchases of defendants' generic doxycycline and/or generic digoxin products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families Excluded from the Class are employees or agents of Defendants and their subsidiaries and affiliates, all persons who make a timely request to be excluded from the Class, and the judge to whom this case is assigned and his or her immediate family.   Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

70.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

71.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

72.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.   The precise number of Class members is unknown to Plaintiff at this time, but may be ascertained from Defendants' records.   Plaintiff is informed and believes that there are at least several thousand Class members.   Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

73.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)  Whether Defendants engaged in the conduct alleged herein;

(b) Whether Defendants conspired to fix, maintain, stabilize, or increase the price of digoxin;

(c) Whether Defendants conspired to fix, maintain, stabilize, or increase the price of doxycycline;

(d) Whether Plaintiff and members of the Classes were injured by Defendants' conduct; and

(e) Whether Plaintiff and members of the Class are entitled to equitable and injunctive relief.

74.     Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants, as described above.

75.     Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other members of the Classes it seeks to represent.  Furthermore, Plaintiff has retained counsel competent and experienced in complex class action litigation.  The Class's interests will be fairly and adequately protected by Plaintiff, which intends to prosecute this action vigorously, and by Plaintiff's skilled and experienced counsel.

76.     Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Class as a whole.

77.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be

impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

78.     Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
### Violation of Sections 1 and 3 of The Sherman Antitrust Act
### (15 U.S.C. § 1, 3)

79.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

80.     During the Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

81.     Specifically, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of generic doxycycline and/or generic digoxin in the United States.

82.     As a result of Defendants' unlawful conduct, prices for generic doxycycline and/or generic digoxin were raised, fixed, maintained, and stabilized in the United States.

83.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

84.     For the purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

(1) participating in meetings and conversations to discuss the prices and supply of generic doxycycline and/or digoxin;

(2) communicating in writing and orally to fix prices of generic doxycycline and/or digoxin;

(3) agreeing to manipulate prices and supply of generic doxycycline and/or digoxin sold in the United States in a manner which deprived purchasers of free and open competition;

(4) issuing price announcements and price quotations in accordance with the agreements reached;

(5) selling generic doxycycline and/or generic digoxin to customers in the United States are supracompetitive prices; and

(6) providing false statements to the public to explain increased prices for generic doxycycline and/or generic digoxin.

85.     As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for generic doxycycline and/or digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF
### Violation of California's Cartwright Act,
### Cal. Bus. & Prof. Code § 16700, *et seq*.

86.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87.     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

88.     California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

89.     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

90.     A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. Id. at § 16726.

91.     Plaintiff purchased global in charging cts. - and/or paid for" generic doxycycline and/or digoxin within the State of California during the Class Period.  But for Defendants' conduct set forth herein, the price of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

92.     Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

93.     Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of generic doxycycline and/or digoxin in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Violations of California's Unfair Competition Law**
**Cal.  Bus. & Prof. Code § 17200, *et seq*. (the "UCL")**

94.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

95.     The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq*. of California Business and Professions Code.

96.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

97.     This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

98.     The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of section 16720, *et seq*., of California Business and Professions Code, set forth above.

99.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq*., of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

100.    Plaintiff and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

101.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

102.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Class to pay supra-competitive and artificially-inflated prices for generic doxycycline and/or digoxin sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

103.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Under California Common Law**

104.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

105.    Plaintiff and members of the California Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of California during the

Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline or digoxin would have been lower, in an amount to be determined at trial.

106.    Defendants unlawfully overcharged Plaintiff and members of the California Class, who made purchases of Defendants' generic doxycycline and/or digoxin in California at prices that were more than they would have been but for Defendants' actions.

107.    Plaintiff and California Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and California Class members.

## FIFTH CLAIM FOR RELIEF
### Violation of the Iowa Competition Law
### Iowa Code § 553.1, *et seq.*

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

109.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

110.    Plaintiff and members of the Iowa Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

111.    Defendants contracted, combined or conspired to restrain or monopolize trade in the market for generic doxycycline and/or digoxin, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for generic doxycycline and/or digoxin, in violation of Iowa Code § 553.1, *et seq.*

112.   Plaintiffs and members of the Iowa Class were injured with respect to purchases of generic doxycycline and/or digoxin in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Under Iowa Common Law**

113.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

114.   Plaintiff and members of the Iowa Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

115.   Defendants unlawfully overcharged Plaintiff and members of the Iowa Class, who made purchases of Defendants' generic doxycycline and/or digoxin in Iowa at prices that were more than they would have been but for Defendants' actions.

116.   Defendants have been enriched by revenue resulting from unlawful overcharges for Defendants' generic doxycycline and/or digoxin, which revenue resulted from anticompetitive prices paid by Plaintiff and members of the Iowa Class, which inured to Defendants' benefit.

117.   Defendants' enrichment has occurred at the expense of Plaintiff and Iowa Class members.

118.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

26

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Kansas Restraint of Trade Act**
**Kan. Stat. Ann. § 50-101, *et seq.***

119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

120.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

121.    Plaintiff and members of the Kansas Classs purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

122.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

123.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of generic doxycycline and/or digoxin, increasing the price of generic doxycycline and/or digoxin, preventing competition in the sale of generic doxycycline and/or digoxin, or binding themselves not to sell generic doxycycline and/or digoxin, in a manner that established the price of generic doxycycline and/or digoxin and precluded free and unrestricted competition among themselves in the sale of generic doxycycline and/or digoxin, in violation of Kan. Stat. Ann. § 50-101, et seq.

124.    Plaintiff and members of the Kansas Class were injured with respect to purchases of generic doxycycline and/or digoxin in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**EIGHTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Under Kansas Common Law**

125.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

126.    Plaintiff and members of the Kansas Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

127.    Defendants unlawfully overcharged Plaintiff and members of the Kansas Class, who made of Defendants' generic doxycycline and/or digoxin in Kansas at prices that were more than they would have been but for Defendants' actions.

128.    Plaintiff and Kansas Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Kansas Class members.

129.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Kansas Class Members.

130.    Defendants were unjustly enriched at the expense of Plaintiff and Kansas Class members.

**NINTH CLAIM FOR RELIEF**
**Violation of the Minnesota Antitrust Law,**
**Minn. Stat. § 325D.49, *et seq*.**

131.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

28

132.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

133.    Plaintiff and members of the Minnesota Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

134.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

135.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for generic doxycycline and/or digoxin within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for generic doxycycline and/or digoxin within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for generic doxycycline and/or digoxin within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

136.    Plaintiff and members of the Minnesota Class were injured with respect to purchases of generic doxycycline and/or digoxin in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

### TENTH CLAIM FOR RELIEF
**Violation of the Minnesota Consumer Fraud Act,**
**Minn. Stat. § 325F.68, *et seq.***

137.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

138.    By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, *et seq.*

139.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

140.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the generic doxycycline and/or digoxin market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the generic doxycycline and/or digoxin market.

141.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

142.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

143.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

144.    Defendants' conduct was willful.

145.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

30

146.    By reason of the foregoing, the Plaintiff and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

### ELEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Under Minnesota Common Law**

147.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

148.    Plaintiff and the Minnesota Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

149.    Defendants unlawfully overcharged Plaintiff and members of the Minnesota Class, who made purchases of Defendants' generic doxycycline and/or digoxin in Minnesota at prices that were more than they would have been but for Defendants' actions.

150.    Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiff and Minnesota Class members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Class members.

151.    It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and Minnesota Class members.

### TWELFTH CLAIM FOR RELIEF
**Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat. § 407.010, _et seq._**

152.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

153.     Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

154.     Plaintiff and the Missouri Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

155.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667, 669 (Mo. 2007).

156.     Defendants contracted, combined or conspired in restraint of trade or commerce of generic doxycycline and/or digoxin within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for generic doxycycline and/or digoxin within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

157.     Plaintiff and members of the Missouri Class were injured with respect to purchases of generic doxycycline and/or digoxin in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## THIRTEENTH CLAIM FOR RELIEF
### Unjust Enrichment
### Under Missouri Common Law

158.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

159.    Plaintiff and members of the Missouri Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Missouri during the Class Period.   But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

160.    Defendants unlawfully overcharged Plaintiff and members of the Missouri Class, who made purchases of Defendants' generic doxycycline and/or digoxin in Missouri at prices that were more than they would have been but for Defendants' actions.

161.    Plaintiff and Missouri Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Missouri Class Members.

162.    Defendants appreciated the benefit bestowed upon them by Plaintiff and Missouri Class members.

163.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Missouri Class members.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of the Nebraska Junkin Act,
### Neb. Rev. Stat. § 59-801, *et seq.*,

164.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

165.     Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

166.     Plaintiff and members of the Nebraska Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

167.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

168.     Defendants contracted, combined or conspired in restraint of trade or commerce of generic doxycycline and/or digoxin within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for generic doxycycline and/or digoxin within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq*.

169.     Plaintiff and members of the Class were injured with respect to purchases of generic doxycycline and/or digoxin in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**FIFTEENTH CLAIM FOR RELIEF**
**Violation of the Nebraska Consumer Protection Act,**
**Neb. Rev. Stat. § 59-1602, *et seq.***

170.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

171.    By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq*.

172.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the generic doxycycline and/or digoxin Market, a substantial part of which occurred within Nebraska.

173.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the generic doxycycline and/or digoxin market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

174.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

175.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

176.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and Nebraska Class members' ability to protect themselves.

177.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

178.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

179.     By reason of the foregoing, Plaintiff and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

**SIXTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Under Nebraska Common Law**

180.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

181.     Plaintiff and members of the Nebraska Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Nebraska during the Class Period.  But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

182.     Defendants unlawfully overcharged Plaintiff and members of the Nebraska Class, who made purchases of Defendants' generic doxycycline and/or digoxin in Nebraska at prices that were more than they would have been but for Defendants' actions.

183.     Defendants received money from Plaintiffs and Nebraska Class members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.

184.     In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiff and Nebraska Class members.

## SEVENTEENTH CLAIM FOR RELIEF
### Violation of Section 340 of the New York General Business Law

185.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

187.    Plaintiff and members of the New York Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

188.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

189.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of generic doxycycline and/or digoxin and restrained competition in the free exercise of the conduct of the business of generic doxycycline and/or digoxin within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

190.    Plaintiff and members of the New York Class were injured with respect to purchases of generic doxycycline and/or digoxin in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

**EIGHTEENTH CLAIM FOR RELIEF**
**Violation of the South Dakota Antitrust Statute,**
**S.D. Codified Laws § 37-1-3.1, *et seq.***

191.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

192.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1-3.1, 3.2.

193.    Plaintiff and members of the South Dakota Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

194.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

195.    Defendants contracted, combined or conspired in restraint of trade or commerce of generic doxycycline and/or digoxin within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of generic doxycycline and/or digoxin within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, et seq.

196.    Plaintiffs and members of the Class were injured with respect to purchases of generic doxycycline and/or digoxin in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## NINETEENTH CLAIM FOR RELIEF
### Violation of the South Dakota Deceptive Trade Practices
### and Consumer Protection Law, S.D. Codified Laws § 37-24, *et seq.*

197.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

198.    By reason of the conduct alleged herein, Defendants have violated S.D. Codified Laws § 37-24-6.

199.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

200.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the generic doxycycline and/or digoxin market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the generic doxycycline and/or digoxin market.

201.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

202.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

203.    Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

204.    Defendants' conduct was willful.

205.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

206.    By reason of the foregoing, Plaintiff and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**TWENTIETH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Under South Dakota Common Law**

207.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

208.    Plaintiff and members of the South Dakota Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

209.    Defendants unlawfully overcharged Plaintiff and members of the South Dakota Class, who made purchases of Defendants' generic doxycycline and/or digoxin in South Dakota at prices that were more than they would have been but for Defendants' actions.

210.    Plaintiff and South Dakota Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and South Dakota Class Members.

211.    Defendants were aware of the benefit bestowed upon them by Plaintiff and South Dakota Class members.

212.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiff and South Dakota Class members.

**TWENTY-FIRST CLAIM FOR RELIEF**
**Violation of the Utah Consumer Sales Practices Act,**
**Utah Code Ann. §§ 13-11-1, *et seq.***

213.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

214.    By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

215.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the generic doxycycline and/or digoxin market, a substantial part of which occurred within Utah.

216.    Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

217.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the generic doxycycline and/or digoxin market.

218.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

219.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

220.    Defendants knew or had reason to know that their conduct was unconscionable.

221.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Utah Class.

222.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

223.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

224.   By reason of the foregoing, the Plaintiff and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

## TWENTY-SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### Under Utah Common Law

225.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

226.   Plaintiff and members of the Utah Class purchased, paid, and/or provided reimbursement for generic doxycycline and/or digoxin within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price per unit of generic doxycycline and/or digoxin would have been lower, in an amount to be determined at trial.

227.   Defendants unlawfully overcharged Plaintiff and members of the Utah Class, who made purchases of Defendants' generic doxycycline and/or digoxin in Utah at prices that were more than they would have been but for Defendants' actions.

228.   Plaintiff and Utah Class members have conferred a direct economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges paid by Plaintiff and the Utah Class members and accepted and retained by Defendants, to the economic detriment of Plaintiff and Utah Class members.

229.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Utah Class members.

230.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Utah Class Members.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B.    Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

C.    Defendants and their co-conspirators be permanently enjoined and restrained from continuing and/or maintaining the conspiracy or agreement alleged herein;

D.    Treble and/or punitive damages as permitted by applicable laws;

E.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F.    An award of costs and attorneys' fees; statutory fees, and costs, as applicable, and

G.    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues so triable.

DATED: June 29 , 2016              /s/Jeffrey L. Kodroff (JLK 4986)
                                   Jeffrey L. Kodroff
                                   Jeffrey J. Corrigan
                                   **SPECTOR ROSEMAN KODROFF &
                                   WILLIS, P.C.**
                                   1818 Market St., Suite 2500
                                   Philadelphia, PA 19103
                                   Tel: (215) 496-0300
                                   Fax: (215) 496-6611
                                   jkodroff@srkw-law.com
                                   jcorrigan@srkw-law.com

                                   **WOLF HALDENSTEIN ADLER
                                   FREEMAN & HERZ LLP**

                                   Fred T. Isquith, Sr.
                                   Thomas H. Burt
                                   Anita Kartalopolous
                                   270 Madison Ave.
                                   New York, New York 10016
                                   Tel.: (212) 545-4600
                                   Fax: (212) 686-0114
                                   burt@whafh.com
                                   kartalopolous@whafh.com

                                   **WOLF HALDENSTEIN ADLER
                                   FREEMAN & HERZ LLC**

                                   Theodore B. Bell
                                   Carl V. Malmstrom
                                   One South Dearborn St., Suite 2122
                                   Chicago, Illinois 60603
                                   Tel: (312) 984-0000
                                   Fax: (312) 212-4496
                                   tbell@whafh.com
                                   malmstrom@whafh.com

                                   **FELHABER LARSON LLC**

                                   Michael McNally
                                   220 South 6th St., Suite 2200
                                   Minneapolis, Minnesota 55402

44

Tel: (612) 339-6321
Fax: (612) 338-0535
mcnally@felhaber.com

***Attorneys for Plaintiff and the Proposed
Class***